May it please the court, your honors my name is Phil Scanlon and I represent the appellant Travis Broeker. Now this case is on appeal after Mr. Broeker was found guilty of both conspiracy to distribute fentanyl and also distribution of fentanyl resulting in death. This appeal concerns only the latter charge. I'm arguing two points. First, that Mr. Broeker's conviction sentence should be overturned and vacated as the jury verdict of guilty was found despite insufficient evidence that the fentanyl ingested by the decedent was the same fentanyl that he obtained from Mr. Broeker. The second argument is that even if the court finds that the evidence is sufficient that justice necessitates Mr. Broeker receiving a new trial in light of the evidentiary weight combined with improper limitations on Mr. Broeker's ability to further his defense. And his defense was simply that the decedent had alternative sources of a lot of different drugs, chief among them fentanyl and that he died from fentanyl gained from an alternative source or at the very least evidence of alternative sources raised the issue of reasonable doubt. With respect to the first argument, the evidence argument, here's what the trial revealed. Number one, that the decedent had a longstanding substance abuse issue. Number two, that on the day in question Mr. Broeker provided six fentanyl capsules to the decedent. The decedent goes home and either he ingests three capsules worth or a portion of three capsules worth, overdoses, goes to the hospital. Now while the decedent's at the hospital, his roommate seizes the remaining three capsules as well as the decedent's cell phone. The decedent comes home, he's driven home by an unknown person, he's with the roommate until about 2 a.m. And then there's a four hour window and then the decedent's found deceased in his bedroom around 6 a.m. Toxicology results showed that there was a variety of illegal substances within the decedent's system, among them fentanyl. And throughout the trial, Mr. Broeker was not allowed to inquire about or attempt to admit evidence concerning text messages regarding the decedent's attempts to find other means of obtaining illegal drugs, specifically fentanyl and opiates. But weren't those text messages, weren't the responses, I don't have any drugs from the other dealers? Yes, Judge Strauss, specifically regarding Defendant Exhibit B. And the record is somewhat convoluted, not convoluted, but I thought trial counsel did a great job. I wish there was an offer of proof, but there were a large amount of text messages and trial counsel conceded that I will narrow these messages to a particular day. Well, is there anything in the record on appeal, is there a message in the record on appeal other than I don't have anything to sell you? Not a physical exhibit. Trial counsel did attempt to inquire about or begin to inquire about other text messages that were obtained. Now, are we in chambers or are we in front? This was during the cross-examination of Mr. Dotson, who did the cell phone data dump, as well as Detective Persich. And the question asked was, did you find evidence of the other illegal drugs found in the feeding system when cross-examining Detective Persich? And with Mr. Dotson, you know, there was a question about, did you find any text messages regarding to Percocets or opiates? Now, I think it was Ativan or something. I think the Ativan issue is actually a pretty interesting issue, that there were other drugs that were not connected to the dealer, to broker, who wasn't selling Ativan and there was no evidence that he had it. But I'm just not sure about the text messages because what relevance do they have? It just shows that the decedent here was trying to get drugs and that nobody else said they had any. And I don't understand what the relevance of those text messages would have been at trial. So leaving aside the Ativan. Understood, Your Honor. I believe the relevance would be, it goes to show that in combination with the fact that there was evidence that the decedent had a substance abuse issue, I think it's reasonable to infer that reaching out to somebody under the limitations of what could be admitted or inquired about, it's not like he reached out to this person and Mr. Broker and that's it. But it has to be relevant in time. Sure, I would agree with you. We know there are three unconsumed capsules that Mr. Broker sold. What else, what do these text messages show about the possibility that, I guess after he got home from the hospital and was done chatting with Fenton, he went off and got him somewhere else. Understood, Judge Logan. That would imply that he didn't have additional fentanyl that was obtained prior to that date or during the time from when he left the hospital to getting home. We wanted to put in some things that would permit the jury to speculate. I wouldn't go so far as... This is not an issue on appeal, frankly. Understood, Judge. And the reason why the first point is important is that, although in my opinion the stronger point is the second one, the law allows for this court to reweigh the evidence in determining whether a new trial should be granted. In that same vein... I thought your argument was that it was a Burrage argument. This is not a Burrage, I think it's Burrage, but anyway, this is not that argument. It has nothing to do with that. The whole brief was about Burrage, and we're talking just straight sufficiency of the evidence appeal. Burrage was touched on, Your Honor. But the main two points were sufficiency of the evidence, and in light of... to inquire about or admit evidence of alternative sources was such that it prejudiced Mr. Broker's right to a fair trial. I mean, the government's theory in this case is simple, specifically related to the charge in question, that Mr. Broker provided fentanyl to the defendant resulting in death. The defense was simple, that there were alternative sources. A jury heard that, and it came to its verdict. And didn't even list as an issue on appeal that the exclusion of these text messages was reversible error. I'm sorry, Judge, can you repeat that? Well, you could have made as a separate issue on appeal that the exclusion of these text messages was reversible error. And, Judge, I obviously didn't make it clear enough, but I believe that was contained under section 3. Roman numeral 2, which was the second argument. Well, but the weight of the evidence, that doesn't get to exclusion of evidence. You don't get a new trial under the weight of the evidence argument by saying the judge made an evidentiary error. Correct. That's a separate issue. Correct, but that in conjunction with the evidentiary rulings... No, the evidentiary ruling doesn't come into play. It's there. The evidence is what the evidence is. If there was an evidentiary error, that's a separate issue for appeal. Correct, Judge. Amaya is the case that I'm basing this off of, the 2013 Eighth Circuit case. In stating that, in reviewing the denial of motion for new trial, that's where evidentiary weight, as well as, and put into that argument as a sub-argument to the overarching argument, was that weight combined with the inability to both inquire and admit evidence. No, you didn't preserve that. It's not a sub-argument. It's an unpreserved issue. I believe it was directed to you and preserved... It's not preserved on appeal because it isn't in your statement of issues on appeal. Judge, unless I submitted a brief that was in error, I believe it was in there, but clearly I didn't make it... No, it's in there, but it's not a separate issue. It's being argued like a separate issue. And then we can't even figure out what the record on appeal has with respect to that issue. I know you're looking for a new playing field, but you don't get that one. Understood, Judge. I thought you were going to argue under barrage that there was no but-for showing, and then I was going to get into the definition in Cathy of what that requires, and I was going to ask you, isn't that exactly what Norfleet testified to? And you've got a big section of the brief that says Norfleet was a medical examiner who was in cahoots with the prosecutor and so forth. And Judge, I believe that is part of the sufficiency of the evidence argument. Judge, I'm way over time. Can I... Well, I just... A straight sufficiency of the evidence argument as we look at it. Put a reasonable jury on the evidence for it. Sure. And that's all you presented. And then the weight is the same. That's straightforward. Well, I would respectfully disagree, but understood. Well, I know, but if you've got a case that says it's... All right. I understand your position. Thank you, Judge. And I know I've used your time, but whatever time I can use on rebuttal. We used your time. I used your time. Hey, you're the judge. Thank you. Mr. Wadalawala. No. That's correct, Your Honor. Yes. Excuse me if I messed that up. You didn't, and it wouldn't have been the first time. All right. May it please the court. Mr. Scanlon. Good morning, Your Honors. My name is Noman Wadalawala, and it is my privilege to be here with you this morning on behalf of the government. I also served as trial counsel on this matter, along with my colleague, Assistant United States Attorney Serena Whistler. Your Honors, before I proceed with my argument and address some of the concerns that were brought up when Mr. Scanlon was up here, I did want to point out a crucial error in Mr. Scanlon's brief, specifically on page 27 and 28. On these two pages, it mentions that, and I'm paraphrasing, that there were 20 pills found in the victim's room, 20 heroin and fentanyl pills found in the victim's room when detectives searched his bedroom after his fatal overdose. However, if we look at the trial transcript, specifically volume three, page 125 and 126, we see that the victim's roommate, when he confiscated the victim's phone, provided it to law enforcement officers. And law enforcement officers then used that phone to contact Mr. Broeker, set up an undercover buy. And Mr. Broeker then sent his girlfriend on his behalf. And when she arrived, she actually provided the law enforcement officers with the 20 fentanyl pills, which were identical to the three fentanyl pills that the roommate also provided to law enforcement officers from the victim's bedroom. So, these 20 pills actually were not in the victim's bedroom. And in fact, there were actually no heroin and fentanyl pills in the victim's bedroom other than the three that the roommate provided the law enforcement officers. Now, the government's position here is that the district court did not err when it overruled the defendant's motion for judgment of acquittal because the government did provide significant evidence that there was a causal link between Mr. Broeker, who met with the victim, sold the victim fentanyl, and then it was that fentanyl that actually led to the victim's death. Mr. Broeker actually conceded at trial. That wasn't argued this morning.  It's been briefed. Yes, Your Honor. And so, to address the points that actually were argued just now, I will actually talk about, and I believe Judge Strasse brought this up, with regards to the other drugs that were in the victim's bloodstream. Dr. Norfleet actually addressed that, the medical examiner, when he testified. He specifically said that the lorazepam, gabapentin, and bupropion that was in the victim's bloodstream was diagnostically insignificant for him to label this as a mixed drug intoxication. He concluded that the level of fentanyl in the victim's bloodstream was so high that it was incompatible and inconsistent with life. And so his conclusion was that the cause of death here was, in fact, fentanyl intoxication. Well, let me ask you this. So, the reason why I was concerned about that is not only do you have those drugs in his system, but my recollection is they actually found pills in the room showing that he was able to obtain drugs from another dealer. And I don't think, wasn't it cut off, that line of questioning was cut off about asking about those other pills in the bedroom. Maybe I'm wrong about that. No, Your Honor, you're correct. So, there was some lorazepam pills that were found in the bedroom. But again, even with those being found, it's not relevant here because at whatever point in time he obtained these lorazepam pills. What we saw when the medical examiner and the toxicologist looked at the narcotics that were in his bloodstream, it was not significant enough here to actually... No, I understand that. But drug dealers are not always one drug pony, so to speak, which is to say that if you sell one kind of drug, you might sell other kinds of drugs, too. So, this goes to show that he bought from multiple dealers. And it's quite possible that the dealer he bought those pills from may have given him more fentanyl. I mean, a lot of this is speculation, but it seems to me like going down that line could have been relevant to show that he had multiple dealers providing drugs. Your Honor, he could have had multiple dealers providing drugs, but what we do know is that the government presented evidence that Mr. Broker was the one who sold him the fentanyl, and it was the fentanyl that actually led to his death. Right. So, there wasn't any other evidence provided that there was any other type of drugs. Could the lorazepam, could whoever sold him the lorazepam, which was not Mr. Broker, also have sold him fentanyl? And I think that's the point I'm trying to make as to what I think they were trying to prove. It could have been a possibility. However, what we see here is that there was an admission and a concession by Mr. Broker that he, in fact, did sell him the fentanyl, and those were the only fentanyl pills that were found. And I think strong evidence of that is the fact that the three fentanyl pills that the victim gave to law enforcement officers were identical to the fentanyl pills that were from the control buy that Ms. Barton brought at the, and turned over to law enforcement officers. So, the third party essentially would have had to sell the exact same pills, you know, if there were a third party dealer, to be able to connect them to the pills that were actually found, which does strengthen your argument. Yes, Your Honor, I would agree. There was also this issue about Exhibit B. So, Exhibit B is five text messages. There are no other text messages that are being challenged here. It's just those five text messages that they're asking that should have been admitted into evidence. And I agree with the court here that if we look at the context, two of the text messages, it was the victim who had sent a message out saying, do you have anything? And simultaneously, he had actually sent that message to Mr. Broker as well. And the response from the unknown third party was, no, I don't. And so, therefore, we correctly believe that the district court denied that it adds no relevancy here. Do you think it's an issue on appeal? No, Your Honor. It was brought up in the brief. I know, but doesn't it have to be in the, you know, you've read the Federal Rules of Appellate Procedure. It has to be in your Statement of Issues, doesn't it? Yes, Your Honor, I agree. Erroneous abuse of discretion in excluding evidence. Correct, Your Honor, I would agree. Is a distinct legal issue. Is it preserved for us? Your Honor, I would say it's not. Your Honor, I see that the government feels that we have addressed the issues. I do want to just quickly highlight Dr. Riley and Dr. Norfleet's testimony. I do believe that that strengthens our argument because we had two experts testify. Dr. Riley did specifically say that the fentanyl, that fentanyl alone could cause a person to stop breathing and that fentanyl alone could kill someone. Whereas, lorazepam, gabapentin, and bupropion cannot. And it was Dr. Norfleet who took her report, applied it to this specific set of circumstances, and there was no evidence presented to the jury to the contrary. Unless there are any other further questions, I would simply ask this Court to affirm Mr. Broker's conviction. Thank you. Very good, thank you. Is there rebuttal time? His time had expired, Your Honor. All right, I think we understand the issues. The case has been thoroughly briefed and the argument has been helpful. We will take it under advisement.